IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )
                             )
        v.                   )
                             )    2:04cr329
VIKRAM YAMBA                 )    Judge Thomas M. Hardiman
                             )
            Defendant.       )

## OPINION

On December 22, 2004, a grand jury indicted Defendant Vikram Yamba (Yamba) on

seven counts of wire fraud in violation of 18 U.S.C. §§1342 and 1343. On April 11, 2005,

Yamba filed a motion to suppress evidence and the Court held an evidentiary hearing on

November 29, 2005. For the reasons that follow, Yamba's motion will be denied.


I.      **Findings of Fact**

On March 17, 2004, Officer Matthew Livingstone (Livingstone) observed a U-Haul truck

parked at a gas station in such a way that it partially blocked one of the station's main entrances

and some of its parking spaces. Officer Livingstone approached the vehicle to determine why the

driver had left it in this position. As he came alongside the vehicle, Livingstone noticed that the

driver, Charles Coleman (Coleman), was holding an open pocket knife in a raised position. In

addition, Officer Livingstone observed quick and furtive movements by the other two passengers,

Defendant Yamba and Jimaah Kpakpo (Kpakpo).

Officer Livingstone inquired of Coleman about his business at the station. Coleman responded that he, Yamba, and Kpakpo were meeting friends so they could deliver the furniture contained in the U-Haul truck. When asked by Officer Livingstone, however, Coleman could provide neither the location of the delivery nor the names of the friends he was meeting. After hearing Coleman's response, Livingstone then asked to see Coleman's driver's license and the rental agreement for the truck, and asked him if there was anything else in the truck that he should know about. Coleman responded in the negative and told Livingstone that he could search the truck. Before Livingstone searched the truck, he asked Coleman to step out of the vehicle so he could conduct a patdown search. Livingstone then relayed Coleman's information to the dispatcher, who reported that there was an outstanding arrest warrant on Coleman. Upon hearing of the outstanding warrant, Livingstone handcuffed Coleman and placed him in the police car.

Once Coleman was in the police car, Livingstone asked Yamba and Kpakpo to step out of the truck so he could conduct a patdown search of both men. During the patdown, Livingstone felt a plastic bag in Yamba's right jacket pocket. Officer Livingstone testified credibly:

> As I was conducting the pat-down, along the right side, right coat pocket, I could feel a plastic bag. I noted through training and experience narcotics are stored and transported in plastic baggies. After a brief second of just feeling it, I could tell that there was a soft spongy-like substance that is consistent with marijuana inside. I then recovered the bag from his pocket and found it contained suspected marijuana.

Hearing Transcript (Tr.) at 13-14. Once Livingstone concluded that the bag contained marijuana, he handcuffed Yamba and put him in the police car with Coleman. The patdown search of Kpakpo was uneventful and Livingstone handcuffed him merely for officer safety.

2

At this point, Livingstone and another officer searched the rear of the truck and found that it contained new furniture, still wrapped in plastic. Livingstone questioned the three men about the furniture, and eventually Kpakpo said that he owned it, had purchased it with a credit card, and was selling it. About this time, the dispatcher radioed Officer Livingstone to advise him that her previous statement that Coleman was the subject of an outstanding arrest warrant was erroneous but that Coleman had a suspended license. Livingstone then wrote Coleman a citation for driving with a suspended license and let Coleman and Kpakpo go. Because Coleman was the only driver authorized by the U-Haul rental contract and was ineligible to drive because of his suspended license, Livingstone impounded the U-Haul. In addition, he arrested Yamba because of the suspected marijuana found on his person.

Livingstone brought Yamba to the police station and during a standard inventory search he turned over several slips of paper with the words "credit card" and lines of numbers alternating down the page. Livingstone inquired "what are these?" and Yamba responded that he received them from a friend. At this point, Livingstone read Yamba his *Miranda* warnings and questioned him. Based on Yamba's answers, Livingstone obtained a search warrant for the U-Haul truck.

## II.     Analysis

### A.     *Constitutionality of Officer Livingstone's Interaction With Coleman*

The threshold requirement for any Fourth Amendment analysis is government action that constitutes a search or seizure. The Supreme Court has made clear that not all interactions between police and citizens implicate Fourth Amendment concerns. Police officers may

3

approach individuals without reasonable suspicion or probable cause, and may question them without violating the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Such a "citizen encounter," the Court has explained, does not constitute a search or seizure under the Fourth Amendment: "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). An individual approached in this manner "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Royer*, 460 U.S. at 498. Accordingly, the Court has held this to be a "consensual encounter that implicates no Fourth Amendment interest." *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984).

Beyond such a casual encounter, a brief "stop and frisk" is constitutionally acceptable if the officer has a "reasonable suspicion that criminal activity is afoot." *U.S. v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Because a *Terry* stop is more intrusive then the citizen encounter described in *Bostick*, it constitutes a search and seizure within the meaning of the Fourth Amendment. The reasonable suspicion upon which the officer relies to institute a *Terry* stop must "be based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. In determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers. " *Id.*

In the case at bar, Livingstone's initial approach of the vehicle and interaction with Coleman constituted a citizen encounter that did not implicate Fourth Amendment protections.

4

Livingstone's subsequent decision to question and patdown Coleman was based on the behavior

of the individuals in the truck and the immediate discovery of a weapon, both of which were

sufficient to give a reasonable officer articulable suspicion that criminal activity was afoot. In

*Rickus*, the officers observed a car moving very slowly, stopped the vehicle, and asked the driver

for identification. The Supreme Court found this conduct consistent with *Terry*, stating: "A

brief stop of a suspicious individual, in order to determine his identity or to maintain the status

quo momentarily while obtaining more information, may be most reasonable in light of the facts

known to the officer at the time." *Id.* at 366. Accordingly, Officer Livingstone's initial conduct

was reasonable under the Fourth Amendment.

### B. *Constitutionality of Officer Livingstone's Interaction With Yamba*

#### 1. *Terry* Frisk of Yamba

Despite the facts surrounding the questioning, frisk, and detention of Coleman, Yamba

argues that Livingstone did not have reasonable, articulable suspicion sufficient to justify a

protective frisk of him, as required by the Supreme Court in *Ybarra v. Illnois*, 444 U.S. 85

(1979). The evidence belies Yamba's argument.

In *Ybarra*, the Supreme Court reiterated that the scope of *Terry* frisks must remain

limited to the specific purposes and justifications that support them. *Id.* at 93. There, the police

entered a restaurant to execute a search warrant and chose to frisk every patron present, without

any particular suspicion of criminal activity. The Court found that "the 'narrow scope' of the

*Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion

directed at the person to be frisked, even though that person happens to be on premises where an

5

authorized narcotics search is taking place." *Id.* at 94. In applying this principle to the facts, the Court concluded that "the initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." *Id.* at 92-3.

Subsequent to *Ybarra,* the Supreme Court has taken a slightly different approach in analyzing situations involving searches of individuals found in an automobile that has been stopped. *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) and *Maryland v. Wilson,* 519 U.S. 408 (1997) demonstrate that a police officer may order the driver and passengers to exit the vehicle while the stop is being conducted. Moreover, the Court of Appeals for the Third Circuit recognized that "utilizing the standards set forth by the Supreme Court in cases such as *Terry*, *Long*, and *Mimms*, many courts of appeals have upheld limited weapon pat-downs of passengers where the passengers have engaged in suspicious behavior." *U.S. v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997).

In analyzing whether an officer had a reasonable suspicion, courts "must consider the totality of the circumstances - - the whole picture." *United States v. Valentine* 232 F.3d 350, 353 (3d Cir. 2000) (internal citations omitted). Accordingly, "the significance of furtive actions and flight is equally applicable to both" *Terry* stops and searches incident to arrest, and can be the basis of individualized suspicion sufficient to justify a *Terry* frisk. *U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1972).

In the instant case, before Officer Livingstone decided to frisk Yamba, he had seen Coleman holding a weapon inside the vehicle and had been informed, albeit wrongly, that there was an outstanding warrant for Coleman's arrest. In addition, Livingstone had seen the other two

6

occupants of the truck, Yamba and Kpakpo, make suspicious movements in the cab as he began to question Coleman.  Livingstone testified credibly that he decided to frisk Yamba and Kpakpo because the situation in general, and their behavior in particular, created a fear for his own safety:

> I already had one knife.  I knew there was a weapon in the car, and a lot of times we as police officers like to add plus one.  Where there's one weapon, there's likely to be another weapon.  There was three of them at one point and there was only me and my partner.  So we're outnumbered.  It could possibly have been a threatening situation.  It was for officer safety.

Tr. at 12.

In addition to his concerns about weapons, Livingstone's decision was influenced by the report of the outstanding warrant on Coleman, as well as the behavior of the passengers when he first looked inside the cab.  "The fast movements of the hands going from the dash and then being concealed underneath them and what appeared to be in the pockets was also an issue."  Tr. at 13.  In light of the totality of the circumstances, Livingstone's decision to perform a patdown of Yamba was reasonable.

### 2.    Seizure of Alleged Contraband

Yamba next argues that even if the patdown was reasonable, Livingstone violated his Fourth Amendment rights when he reached his hand into Yamba's pocket and found the plastic bag that contained suspected marijuana.

In the seminal case of *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the Supreme Court addressed the issue of contraband discovered during the execution of a *Terry* frisk.  The Court first recognized that while *Terry* held that an "officer may conduct a patdown search to determine whether the person is in fact carrying a weapon," the "purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of

7

violence." *Id.* at 374 (internal citations omitted). Thus, *Terry* searches "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* (internal citations omitted). The Court cautioned that "if the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* at 373.

At the same time, the Court recognized that other exceptions to the warrant requirement have been established allowing officers to seize things discovered during the execution of a constitutional search. Analogizing the facts in *Dickerson* to the "plain view" exception to the warrant requirement, the Court stated:

> if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object - i.e. if the incriminating character is not immediately apparent - the plain-view doctrine cannot justify its seizure.

*Id.* at 375. The rationale behind the plain view exception is that "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." *Id.*

The *Dickerson* Court then explained that "this doctrine has an obvious application by analogy to cases in which officers discover contraband through the sense of touch during an otherwise lawful search." *Id.* Provided that the discovery occurs during the execution of a

constitutional search, officers can seize contraband without a warrant:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375. As in plain view situations, the seizure is constitutionally permissible because where the contraband's nature is immediately apparent, the seizure is supported by probable cause. "Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Id.* at 376.

In applying the foregoing principles to the facts presented in *Dickerson*, the Supreme Court determined that "the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband." *Id.* at 377. The Court concluded that the officer exceeded the permissible scope of *Terry*, and thus the plain touch exception did not apply. In doing so, the Court gave great weight to the factual findings of the trial court, which were affirmed by the Minnesota appellate courts, that the officer conducting the search "made no claim that he suspected this object to be a weapon," and that his testimony "belies any notion that he immediately recognized the lump as crack cocaine." *Id.* at 378. Significantly, the Minnesota Supreme Court noted that "the officer determined that the lump was contraband only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket - a pocket which the officer *already knew* contained no weapon." *Id.* at 378

9

(emphasis added). Because "the court below determined that the incriminating character of the object was not immediately apparent," *id.* at 379, the Supreme Court concluded that the contraband was uncovered through a subsequent search that exceeded the permissible scope of *Terry*. Therefore, the seizure could not be justified under the plain touch exception.

It appears that the Court of Appeals for the Third Circuit has not yet cited or discussed *Dickerson's* plain touch exception in a precedential case. Therefore, this Court will apply the Supreme Court's decision in *Dickerson*, seeking guidance from other courts of appeals, to decide Yamba's case. The pivotal question presented here, as in *Dickerson*, is whether Officer Livingstone had probable cause to believe that the item in Yamba's pocket was contraband while conducting a valid *Terry* frisk or whether he conducted a further search, beyond the permissible scope of *Terry*, which resulted in the discovery of contraband.

At the hearing on Yamba's suppression motion, Officer Livingstone testified that "after a brief second of just feeling it, I could tell that there was a soft spongy-like substance that is consistent with marijuana inside." Tr. at 13-14. Livingstone was asked more detailed questions about his conclusion that the item in the defendant's pocket was contraband, and the following exchange occurred:

> Q.  Now, you said there was a brief moment, I guess, where you were manipulating the package. Is that fair to say?
>
> A.  Correct. I was kind of feeling around, making sure it was what I knew it to be.
>
> Q.  Can you give us a number of seconds perhaps that you were felt like you were on the bag essentially through the coat?

A.      Probably wasn't even a half second.  It was real quick.  I
        could tell right away.  It was more or less plastic bag contents,
        marijuana.  I knew it was marijuana.

Tr. at 15.  Officer Livingstone also testified to the details of how he recognized the substance,

and his experience in identifying narcotics during patdown searches.  "Up to this point in March

of 2004 I probably had near a hundred incidents where patdowns and some sort of narcotic was

recovered out of a coat pocket or pants pocket from a person."  Tr. at 14.

Based on Officer Livingstone's credible testimony at the hearing, it was immediately

apparent to him that the plastic bag he touched contained a substance that, from his knowledge,

training, and experience, he "knew" to be marijuana.  Livingstone testified that he recognized the

contents to be marijuana immediately, in less than a second, and only continued to touch the

substance to "mak[e] sure it was what I knew it to be."  Although Officer Livingstone described

feeling the item in Yamba's pocket with the same word - "manipulate" - used by the Minnesota

Supreme Court in *Dickerson*, that word does not does not in talismanic fashion dictate the same

result here.  Unlike *Dickerson*, here Officer Livingstone did not continue to search Yamba's

person after he determined that he did not have a weapon.  Rather, in his execution of a *Terry*

frisk, he immediately recognized a plastic bag in Yamba's pocket that contained what he "knew,"

based on his extensive experience, to be marijuana.  At that point, Livingstone had probable

cause to manipulate the bag to confirm his belief.  Accordingly, the Court finds that Officer

Livingstone's conduct is within the boundaries of a permissible "plain touch" seizure established

in *Dickerson*.

Although the Court of Appeals for the Third Circuit has not had the opportunity to

address the issue presented in this case, other courts of appeals have interpreted the meaning of

11

the phrase "immediately apparent" in the context of the plain touch doctrine. In doing so, many courts have upheld the constitutionality of plain touch seizures by distinguishing *Dickerson* and concluding that the seizures were not the result of further searches beyond the scope permitted by *Terry*.

In *United States v. Proctor*, 148 F.3d 39 (1st Cir. 1998), the Court of Appeals for the First Circuit upheld a search based on factual circumstances quite like those present in this case. In *Proctor*, the officer frisked two men he observed entering a building that was under surveillance for suspicion of narcotics activity. While conducting the patdown, the officer "touched the bulge in Proctor's jacket pocket and felt a soft, leafy substance in a glassine bag which he believed to be marijuana." *Id.* at 41. Based on this conclusion, he directed the defendant to empty his pockets and arrested him for possession of marijuana. The First Circuit Court upheld the search because "the district court found that Officer Campbell, upon feeling the bulge, immediately recognized it as a bag containing marijuana." *Id.* at 43. In support of this factual finding, the Court noted that "Officer Campbell testified that he was consistently able to determine the feel of marijuana from conducting numerous patdowns of suspects." *Id.* The facts in *Proctor* closely mirror the facts of the instant case. Like *Proctor*, here an officer with extensive experience recovering narcotics felt a leafy substance in a bag in a jacket pocket, and immediately recognized it as marijuana.

The Ninth Circuit Court held constitutional a similar "plain touch" seizure. *United States v. Mattarolo*, 209 F.3d 1153 (9th Cir. 2000). In *Mattarolo*, a police officer was questioning a defendant who had been acting suspiciously and conducted a *Terry* frisk. During the patdown,

12

the officer felt a bulge that he thought might be a weapon:

> He described the object as a couple of inches long and about an inch in
> circumference.  To determine if it might be a small pocket knife he closed
> his thumb and forefinger around it to see whether it was hard, suggesting a
> possible knife.  Instead of anything hard he felt little chunks in plastic bags
> which he immediately recognized as drugs.  He specifically denied that he
> moved his finger and thumb back and forth so as to manipulate the package
> to help identify the contents as drugs.

*Id.* at 1156.  The Ninth Circuit affirmed the decision because the record indicated that the officer

"did not seek to manipulate the object, but was nevertheless alerted immediately to the presence

of drugs by the familiar sensation of plastic sliding against a granular substance."  *Id.* at 1158.  In

reaching this conclusion, the Court took specific note that the officer "recognized the contents as

drugs, he explained, because of the distinctive feel and his experience gained from thirty to forty

patdowns in which drugs were found in people's pockets."  *Id.* at 1156.

      Like *Proctor* and *Mattarolo*, the Court of Appeals for the Second Circuit in *U.S. v.*

*Rogers*, 129 F.3d 76 (1997) upheld the constitutionality of a seizure based on facts similar to this

case.  In *Rogers*, the police stopped a cab that had flashed its lights in apparent distress and

questioned the passengers.  During the questioning, the defendant reached inside her coat.  The

officer then grabbed the coat to feel for weapons, and felt a "hard object" and a "soft object"

inside a paper bag.  The officer was not certain that the objects were not weapons, nor was he

certain they were contraband.  He looked in the paper bag and found cocaine.  The lower court

determined, and Second Circuit agreed, that the officer's actions were within the limits

established by *Dickerson*:

> Probable cause to believe an object is contraband must arise while an officer
> is conducting a permissible patdown search.  As noted, probable cause to
> believe that contraband was present arose when Sergeant Mason, acting

13

> within the bounds of a protective patdown search, grabbed the object in
> Rogers' pocket, manipulated it for a few seconds, and concluded that it was
> probably drugs. The incriminating character of the object was therefore
> 'immediately apparent.'

*Id.* at 80.  As in this case, the officer in *Rogers* concluded within several seconds that the item

was contraband.  More notably, the officer in *Rogers* was not absolutely certain that the item was

contraband, yet his conclusion was sufficient to establish probable cause.

In *United States v. Walker,* 181 F.3d 774 (6th Cir. 1999), the police were in the midst of

frisking a suspect and the officer conducting the search felt a bulge in the seat of the defendant's

pants.  He testified that he immediately recognized the item as crack cocaine.  The officer then

removed the defendant's pants and discovered the contraband.  The Court of Appeals for the

Sixth Circuit upheld this search as constitutional under *Dickerson*, stating:

> the seizure of the plastic bag from Walker's buttocks was justified by
> Officer Green's experience as a narcotics officer and his immediate
> recognition that the plastic bag hidden on Walker's body contained crack
> cocaine.  Indeed, at the time of the search, Officer Green had six years of
> experience as a narcotics officer, and he had come across illegal substances
> in plastic bags on many occasions.  Accordingly, when Officer Green felt
> the bulge underneath Walker's pants during his search of Walker's groin and
> buttocks,  Officer Green immediately identified the purpose of the plastic
> bag that he felt.

*Id.* at 779-80.

Similarly, the District of Columbia Circuit, in *United States v. Ashley*, 37 F.3d 678 (D.C.

Cir. 1994) upheld a search when a police officer discovered a bag of crack cocaine in the

underwear of a defendant who consented to be searched.  The case was originally remanded to

the district court for additional findings of fact, which concluded that "from the object's feel,

based upon Detective Hairston's extensive knowledge concerning the packaging and

14

transportation of drugs, Detective Hairston believed that it was narcotics. Prior to this search in 1991, Detective Hairston had recovered drugs from the crotch area of suspects between 10-15 times." *Id.* at 679. Although *Ashley* involved a consent search rather than a *Terry* frisk, the D.C. Circuit deemed the search constitutional under *Dickerson* because "based solely on the sweeping, patting, probing motion, [the officer], with his training and experience, knew immediately that the object was crack cocaine." *Id.* at 681 (internal citations omitted).

In addition to the aforementioned appellate decisions, many district courts have found the existence of probable cause based on facts similar to those presented by the instant case. In *United States v. Jones*, 303 F. Supp.2d 702 (D. Md. 2004), an officer conducting a frisk felt a hard object behind the defendant's waistband. The officer was afraid the item might be a weapon, and grabbed it to immobilize it. When he did so, he felt "a large, hard, irregular object (roughly the size and shape of a hockey puck) wrapped in a plastic bag." *Id.* at 704. At that point, he realized that it was not a weapon, but instead believed it to be drugs. The object turned out to be a six ounce chunk of crack-cocaine wrapped in a plastic bag. In assessing the immediacy of the item's appearance as contraband, the district court in *Jones* stated:

> Although the plain feel doctrine requires that the incriminating character be immediately apparent, it does not require absolute certainty that the object is contraband. To the contrary, the plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon.

*Id.* at 706. Unlike *Dickerson*, where the search went further than necessary under *Terry*, the officer "had probable cause to believe the object was drugs the moment he firmly grasped it." *Id.* at 706 n.9. Like the officer in *Jones*, here Officer Livingstone concluded in a split-second that Yamba had marijuana in his pocket while he conducted a valid patdown search for weapons.

15

*Accord United States v. Williams,* 2005 WL 1902490, (D. Md. 2005) (officer had probable cause to seize plastic bag with cocaine when he was "pretty comfortable" that the contents of the bag were contraband despite fact that it took him "more than a couple of seconds" to conclude it was drugs).

In support of his motion to suppress, Yamba argues that his case is analogous to cases in which courts have declined to recognize the "plain touch" exception. For example, in *United States v. Schiavo*, 29 F.3d 6 (1st Cir. 1994), the First Circuit found *Dickerson* controlling when an officer saw a bulge in the defendant's jacket and questioned him about it. After the officer had determined that the bulge was a paper bag that did not contain a weapon, he proceeded to open it anyway and discovered thousands of dollars in cash. The First Circuit agreed with the trial court in concluding that the "incriminating nature of the bulge in Schiavo's pocket was not 'immediately apparent.'" *Id*. at 9.

Significantly, in *Schiavo*, a period of time elapsed when the officer was convinced that the bag was not a weapon and was unaware that it contained contraband. He then conducted a separate search of the paper bag to determine its contents. Likewise, in *United States v. Campa*, 234 F.3d 733 (1st Cir. 2000), the First Circuit invalidated a search when the police used a *Terry* frisk as an excuse to force the defendant to empty his pockets, without regard to any object felt during the search. "The officer who frisked appellant, Trooper Marron, acknowledged, however, that he made no attempt to distinguish between bulging items that could be weapons and other types of concealed objects, reaching into appellant's pockets whenever he felt a protrusion and emptying all items onto the floor." *Id.* at 739. The indiscriminate search conducted by the officer in *Campa* stands in stark contrast to the actions of Officer Livingstone here, who

conducted a patdown for safety reasons and, in the course thereof, felt a plastic bag that he immediately concluded contained marijuana based on his knowledge and experience.

Yamba also relies on *United States v. Ponce*, 8 F.3d 989 (5th Cir. 1993), where the Fifth Circuit upheld a search that occurred during a traffic stop when the officer conducting the search frisked the defendant once for officer safety and did not find any weapons. *Id.* at 992. He then obtained consent to search the defendant's jacket. When that search was uneventful, the officer asked the defendant if he could pat him down once more, and in doing so found several hundred dollars in the defendant's front pocket. *Id.* In addition, the officer felt a small paper bundle in the small change pocket in the front of defendant's pants. He then reached in and removed the paper, which contained a small amount of heroin. *Id.* The Fifth Circuit upheld the search because the officer's actions were within the scope of the consent given by the defendant to search his person. In *dicta*, however, the Fifth Circuit addressed the government's argument that the search was constitutional under the plain touch exception. While the court's analysis of *Dickerson* was not determinative in the case, it reiterates that the fundamental question in plain touch cases is whether or not the incriminating nature of the contraband was immediately apparent. Using this standard, the Fifth Circuit concluded that the search in *Ponce* would have been unconstitutional absent consent.

> Yancy's pat down of the watch pocket revealed only a 'little bump.' At that point, Officer Yancy's search may have reached the bounds marked by Terry . . . . His further fingering of the bump revealed something 'squishy' that he believed might have been folded dollar bills. Even if the officer's further probing were part of a protective search, Officer Yancy's testimony belies any notion that he immediately recognized the bump as contraband.

*Id.* at 999.

17

The facts in *Ponce* are inapposite to the instant case. There, the officer engaged in a series of searches that would have exceeded the permissible scope of *Terry* and did not result in the immediate recognition of contraband. In fact, despite having determined that the defendant had no weapon, he conducted a second frisk that was intended to uncover any contraband in the defendant's possession.

Yamba also relies on the District of Columbia Circuit's decision in *United States v. Gibson,* 19 F.3d 1449 (D.C. Cir. 1994), which involved a consent search, rather than a *Terry* stop. In *Gibson,* the defendant consented to be searched and the officer conducting the frisk felt a "hard, flat, angular" bulge in the defendant's pocket. This raised the officer's suspicion, and he took the defendant to the bathroom and had him remove his pants. The government conceded that the only way the search could have been permissible was incident to arrest. *Id.* at 1451. The court concluded that there was not sufficient cause to arrest the defendant and invalidated the search. In doing so, the court only briefly mentioned *Dickerson* as standing for the proposition that probable cause can arise from an object felt during a frisk, and held that the discovery of the "hard, flat, angular bulge" did not give the police probable cause to arrest Gibson:

> Cook testified that the object did not feel like anything a person might normally carry in his pocket. He did not testify how often he had encountered such an object during a pat down, and he related nothing from his experience to correlate objects of this sort with criminal activity. The government at oral argument had considerable difficulty explaining how a hard, flat, angular object in someone's pocket would lead a law enforcement officer of reasonable caution to believe an offense had been or is being committed.

*Id.* at 1451. The D.C. Circuit in *Gibson,* like the Fifth Circuit in *Ponce,* did not analyze the seizure in terms of the *Dickerson* plain touch exception and thus the decision does not support Yamba's argument that his case is analogous to cases invalidating seizures under *Dickerson.*

18

Furthermore, in *Gibson* there was no testimony from the officer that he immediately perceived the object to be contraband, and he did not discover the nature of the object until he conducted a further search, in a different location, that involved the defendant removing his pants.

In sum, in *Schiavo*, the only plain touch case Yamba cites where the court invalidated the seizure of contraband, the search in question went far beyond the scope permitted by *Terry*. The interaction between Livingstone and Yamba, on the other hand, was quite different. In the course of a protective patdown of Yamba, Livingstone felt something which he immediately recognized as contraband. At that point, it was not merely permissible, but proper for him to remove and inspect further the plastic bag that he "knew" contained marijuana. Because Officer Livingstone's behavior was within the bounds enunciated by the Supreme Court in *Dickerson* and is consistent with the aforementioned persuasive authorities, he did not violate Yamba's Fourth Amendment rights.

### 3.    Seizure of the Truck

Yamba next argues that the seizure of the U-Haul truck, following the release of Coleman and Kpakpo, violated the Constitution. This argument fails for two reasons. First, Yamba does not have standing to challenge the seizure of the truck. He claims that *Rakas v. Illinois*, 439 U.S. 128 (1979) confers standing to assert that the seizure violates his rights under the Fourth Amendment. However, the Court of Appeals for the Third Circuit, in interpreting *Rakas*, held:

> It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car. Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a

19

search of a third person's premises or property has not had any of his Fourth
Amendment rights infringed.

*U.S. v. Baker*, 221 F.3d 438, 441-2 (3d Cir. 2000) (internal citation omitted).

Similarly, in *U.S. v. Boruff*, 909 F.2d 111 (5th Cir. 1990), the driver of a car rented by

another attempted to challenge the constitutionality of the search and seizure of the vehicle. The

Fifth Circuit held that, despite the fact that he was driving the vehicle,

> Boruff had no legitimate expectation of privacy in the rental car. Under the
> express terms of the rental agreement, Lawless was the only legal operator
> of the vehicle. Lawless had no authority to give control of the car to Boruff.
> The rental agreement also expressly forbade any use of the vehicle for
> illegal purposes. Boruff was well aware of these restrictions when he took
> possession of the car and used it during the smuggling operation. He
> therefore had no legitimate expectation of privacy in it.

*Id.* at 117. Other circuit courts of appeals have held similarly. *See U.S. v. Wellons*, 32 F.3d 117

(4th Cir. 1994) (unauthorized driver of rented car had no legitimate privacy interest); *United

States v. Obregon*, 748 F.2d 1371, 1374-75 (10th Cir. 1984) (person not listed as driver on rental

car agreement had no legitimate privacy interest in car despite renter's permission).

In the instant case, Yamba is one step further removed from a legitimate expectation of

privacy than the drivers in *Boruff, Williams,* and *Obregon.* Yamba neither owned nor leased the

truck in question, and his name was not on the rental agreement. Nor is there any evidence that

he drove the truck or was given permission to do so by Coleman. Thus, Yamba lacks standing to

challenge the seizure of the U-Haul.

Even assuming, *arguendo*, that Yamba had standing to challenge the seizure of the U-

Haul, Livingstone's decision to seize it was constitutional. The Supreme Court stated in *South

Dakota v. Opperman*, 428 U.S. 364 (1976) that "the authority of police to seize and remove from

20

the streets vehicles impeding traffic or threatening public safety and convenience is beyond

challenge." *Id.* at 369. The Court affirmed that principle in *Michigan v. Thomas*, 458 U.S. 259

(1982) and recognized that "the Court [in *Opperman*] found that, since respondent had been

placed under arrest and the other occupant of the car was too young to legally drive, it was proper

for the officers to impound the vehicle and to conduct an inventory search prior to its being

towed." *Id.* at 260.

In *United States v. Walker*, a non-precedential decision by the Tenth Circuit, the court

upheld a seizure under facts nearly identical to those present here. The police impounded the

vehicle because it was blocking the pumps of a gas station, there was no safe place to put it, no

one was available to move it to a safe location, and the defendant had a suspended license. 81

Fed. Appx. 294 (10th Cir. 2003). All of the factors mentioned in *Walker* are present here,

supporting the reasonableness of Livingstone's decision to impound the U-Haul truck.

At the suppression hearing, Officer Livingstone testified that he impounded the truck

because Coleman, the only person whose name was on the rental agreement, had a suspended

license and could not legally drive. Accordingly, none of the three men at the scene could have

moved the vehicle legally, and it would have remained in the lot, obstructing traffic.

Livingstone's decision was reasonable under the circumstances and constitutional under

prevailing law.

### 4. Interrogation and *Miranda* Waiver

Defendant's final argument is that the interrogation at the police station concerning the

credit card numbers found in his pocket violated his rights under the Fifth Amendment, and any

statements he made during the questioning should be suppressed. The Fifth Amendment to the

United States Constitution prohibits the prosecution from introducing a defendant's statements made during a custodial interrogation, unless he is advised of the procedural safeguards protecting his right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 443 (1966). These "warnings are constitutionally required to combat the compelling pressures inherent in custodial police interrogation and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 440 (2000). Statements obtained in violation of *Miranda*, even when voluntary, are inadmissible to prove guilt at trial. *See Michigan v. Mosley*, 423 U.S. 96, 100 (1975); *Miranda* 384 U.S. at 458-59.

Yamba claims that the Supreme Court decisions in *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004), dealing with *Miranda* waivers made after questioning took place, support the conclusion that the Court must suppress his statements in this case. In *Elstad*, a defendant who had not received *Miranda* warnings voluntarily responded to questions that were not designed to violate or avoid the protections of the Fifth Amendment. The police subsequently corrected their mistake, administered the *Miranda* warnings, and obtained a voluntary waiver. The Court concluded:

> it is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* at 310.

Unlike *Elstad*, in *Seibert* the Court was faced with duplicity and coercion when the police engaged in a systematic practice of questioning defendants without issuing *Miranda* warnings in an attempt to induce subsequent waivers under the pressure of previously elicited statements. The Supreme Court distinguished this type of activity from that present in *Elstad*, and held:

> By any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content.

*Seibert* at 612-3. Therefore, the Court determined that waivers procured in this manner are invalid, and held that statements made under such circumstances should be suppressed. Yamba argues that his case is controlled by *Seibert* rather than *Elstad*.

The Court of Appeals for the Third Circuit recently considered a Fifth Amendment challenge in a case involving an un-*Mirandized* confession followed by *Miranda* warnings and a purported waiver. *See United States v. v. Naranjo*, 426 F.3d 221 (3d Cir. 2005). In *Naranjo*, the Court of Appeals stated:

> unless the agents deliberately withheld warnings, *Elstad* controls Naranjo's Miranda claim. If the initial failure to warn Naranjo was inadvertent, [t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Id.* at 232. The case was remanded to the trial court for further factual findings as to whether or not the failure to warn was deliberate. Without reaching a conclusion on the particular facts, *Naranjo* demonstrates that the fundamental protection of the Fifth Amendment is to ensure that

*Miranda* waivers are voluntary, and thus the inquiry is whether the previous statements may have undermined or threatened the voluntariness of waivers subsequently obtained. *Accord United States v. Kiam*, 2005 WL 3578853 (3d Cir. 2006).

Analyzing the instant facts in light of the Third Circuit's decision in *Naranjo*, it is clear that *Elstad*, and not *Seibert*, is controlling here. Livingstone testified that when he discovered the slip of paper in Yamba's pocket, he instinctively asked "[w]hat is this?" Yamba responded that his friend had given him the paper. After this relatively innocuous statement, Livingstone read Yamba his *Miranda* warnings, and obtained a waiver. The Court finds that Livingstone's statement was, in the words of *Elstad*, "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Elstad*, 470 U. S. at 310. As such, the brief, unintentional pre-waiver questioning did not impermissibly taint the fruits of the later interrogation. Yamba's waiver and statements will not be suppressed because the Court finds that they were made voluntarily and were not the product of any of the duplicity or coercion that existed in *Seibert*.

The Court of Appeals' decision in *Reinert v. Larkins*, 379 F.3d 76 (3d Cir. 2004) is apposite as well. There, an officer riding with the defendant in an ambulance, asked "[w]hat happened?" The defendant responded that he had killed the victim, and then had cut himself with a butcher knife. *Id.* at 81. At that point, the officer read the *Miranda* warnings and procured further statements. *Id.* The Court of Appeals concluded that the failure to warn the

24

defendant was inadvertent, and the statements given under the mistaken questioning did not undermine the eventual waiver:

> We are confident that Reinert's case more closely resembles Elstad's than Siebert's. Zimmerman's initial failure to read Reinert his *Miranda* rights, though unfortunate and unexplained, seems much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot. While it would have been preferable for Zimmerman to read Reinert his rights immediately before eliciting the initial response, we conclude that the cure mandated by *Elstad* was met in this case and that, because Reinert's waiver was knowing and voluntary, the post-*Miranda* statement was properly entered into evidence.

*Id.* at 91.

It is clear from the facts of the instant case that the lone, reflexive query asked of Yamba before he was *Mirandized* was similarly inadvertent. Moreover, the defendant's statement in *Reinert* was far more incriminating than the one made by Yamba in this case. Despite the overwhelming incriminatory statement made by Reinert, the Court of Appeals found that because the questioning was not designed to frustrate the defendant's rights, and the subsequent waiver was voluntary, the statement was admissible. *Reinert,* 379 F.3d at 91. Consequently, in light of *Elstad, Seibert, Naranjo,* and *Reinert*, Yamba's waiver of his Fifth Amendment right not to incriminate himself was valid and the statements he made thereafter will not be suppressed.[1]

### 5. Persistence of Taint

Yamba concluded his brief by arguing that since the stop of the defendant was constitutionally impermissible, any evidence gathered thereafter is tainted and inadmissible. Because the Court finds no constitutional violations at any point during Livingstone's interaction

---

[1] The United States conceded that the statement Yamba made before he was *Mirandized* must be suppressed.

with Coleman, Kpakpo, or Yamba, there is no tainted evidence and this argument need not be addressed.

An appropriate Order follows.


_____
Thomas M. Hardiman
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | 2:04cr329 |
| VIKRAM YAMBA | ) | Judge Thomas M. Hardiman |
| | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 6th day of January, 2006, Defendant Vikram Yamba having filed a

Motion to Suppress, to which the United States filed a Response in Opposition, and a hearing

having been held on November 29, 2005, it is hereby

ORDERED that Defendant's motion is DENIED for the reasons set forth in the Opinion

filed herewith.

_Thos M. Hardiman_
Thomas M. Hardiman
United States District Judge